

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00204-CR

_____

QUINCY HENRY, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F18-3546-362

---

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

## I. Introduction

A jury found Appellant Quincy Henry guilty of online solicitation of a minor and assessed his punishment at 25 years' incarceration. *See* Tex. Penal Code Ann. § 33.021. The trial court sentenced Henry accordingly. Overruling Henry's evidentiary sufficiency complaint, we affirm the trial court's judgment.

## II. Henry's Issue

In one issue, Henry argues, "The jury erred when it found [him] guilty of online solicitation of a minor because the evidence was legally insufficient to prove beyond a reasonable doubt that [he] was the person who sent the sexual texts and Facebook messages." Accordingly, Henry does not dispute that sexual texts and Facebook messages were sent to a minor; rather, he disputes whether the State proved beyond a reasonable doubt that he was the person who sent them.

## III. The Evidence

A little after midnight on April 21, 2018, twelve-year-old Jane's phone went off.[1] Jane had left her phone in the bathroom, where Mother discovered it. Thinking that it was odd for her daughter's phone to go off after midnight, Mother wanted to investigate, so she picked up Jane's phone and saw a Facebook alert from Henry, her

---

[1]To protect the complainant's identity, we use an alias. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2). We refer to the complainant's mother as Mother for the same reason.

cousin, whose photograph in the Facebook handle she recognized. Although Mother and Henry were cousins and were Facebook friends, they were not close. Mother reasoned that if something was wrong, Henry would have contacted her, not Jane. Feeling uncomfortable, Mother decided to pose as Jane.[2]

On Facebook, Henry asked for Jane's cell number a couple times before Mother relented. But Mother gave Henry her cell number, not Jane's. From that point forward, Mother and Henry's conversation continued over Mother's cell phone.

Mother testified that during their texting, Henry showed that he was familiar with numerous other relatives. For example, Henry was aware of another relative named Jane and knew the first name of Mother's deceased father. And when Mother mentioned another cousin, Candice, Henry responded that he knew Candice was married to Truck.[3]

Mother added that Henry proposed that they meet at a vacant house in a neighborhood in which she knew Henry had numerous family members. Similarly, Henry used, as a point of reference, a church that she knew was in that same neighborhood.

---

[2]Without going into the details, Mother had misgivings about Henry's father and brother.

[3]Candice is a pseudonym. We use a pseudonym for Candice's husband as well. Contextually, Henry probably identified him by his nickname, although the record is not clear.

Mother testified that after she and Henry completed their conversation, she called the police. Later, a responding police officer took photographs of the communications between her and Henry.

The responding police officer, Samuel Brandt, said that he had manipulated up and down the screen on Mother's phone and taken photographs of those screens, which contained Mother and Henry's conversation. The photographs show that the communications were initially on Facebook with "Quincy Henry" and then were text messages from phone number (214) xxx-xxxx.[4]

Mother explained that because she and Henry were related, they knew the same people. To verify that the 214 number used to text her was Henry's, she contacted these other people and determined that they were using the same 214 number to communicate with Henry. But Mother was not the only person to investigate the offense.

Michelle Haiduk, a criminal investigator for the Denton County Sheriff's Office, testified that she sent a subpoena to the phone carrier to determine who the subscriber was for the phone number used to text Mother. Haiduk also sent a subpoena to Facebook to find out who was operating the Facebook page used to contact Jane and to exchange the initial messages with Mother.

---

[4]Rather than give the actual number, we refer to this as the 214 number.

Regarding Facebook, Haiduk determined that two email addresses were associated with the account, with the first one belonging to someone named Angela Massey and the second one belonging to Henry. The account had been created in 2009.

Haiduk also looked for an IP address attached to the Facebook account. Haiduk explained an IP address as follows:

> [IP addresses] help identify where the person was when they were logging into the account. IP addresses a lot of times will tell you who the person was that was in charge of that account or, for example, if they live in a household with -- if they live in a house, the IP address can tell you what house it goes to. It's almost like the numbers on an address that's on a house. It can tell you where it's at. IP addresses can tell you, most of the time, whose phone it belonged to.[5]

Haiduk learned that the IP address had been assigned to Massey during the relevant time period. Haiduk further learned Massey's home address was in McKinney.

Additionally, through the investigation, Mother had provided Haiduk a cell phone number—the 214 number, which was the number from which the text messages had been sent. It was also the number that appeared in Brandt's photographs. Haiduk determined that Massey was the subscriber. And the home address for the 214 number corresponded to the home address for the Facebook IP address, that is, both were Massey's home address.

---

[5]*See Wenger v. State*, 292 S.W.3d 191, 194 n.2 (Tex. App.—Fort Worth 2009, no pet.) ("An IP address is a unique 32-bit-long code number that each computer acquires automatically through its Internet access provider for connecting to the Internet.").

Haiduk further discovered that Massey's phone plan had two numbers attached to it. One was the 214 number, and the other was (469) xxx-xxxx.[6] Later, Haiduk learned that Henry and Massey were romantically involved.

After reviewing the phone records, Haiduk determined that the text messages sent on April 21 and 22 from the 214 number were missing. Put differently, the text messages that Brandt had photographed off Mother's phone were not among those in the record. Haiduk asserted that someone could have deleted them. Haiduk said that in cases like this one, her experience was that individuals regularly attempt to delete messages.

Haiduk called the 214 number. Although no one responded, Haiduk left a voice message. Someone called back; the caller ID showed the 214 number and Massey's name. The person who called back, however, had a male voice and identified himself as Quincy—Henry's first name.

Haiduk explained that she had asked this male person if he had any information about the case and informed him that that she wanted to talk to Massey. The person responded that he wanted to come in and speak to Haiduk to clear up the matter but asserted that he was at work and would have to call her back to coordinate an interview. But neither that person nor Massey ever called Haiduk back.

---

[6]For purposes of this opinion, we decline to provide the full number.

Haiduk recorded her conversation with this man. Haiduk conceded that she had no way of knowing whether the man's voice was Henry's. Regardless, the recorded message was played for the jury. Later, the jury heard Henry read two paragraphs from the court's charge.

Facebook produced records of Henry's Facebook account from April 1, 2018, to June 1, 2018. Haiduk said that during this two-month period, the records showed that someone logged into Henry's account about twenty-four times from the IP address corresponding with Massey's house. And during the period between April 18 and April 23—the period during which the offense occurred—no one logged in from any other location. The Facebook records also showed that on April 21, 2018, when texting someone else, Henry (or whoever was using Henry's account) had said that his number was the 214 number. The records further showed that on April 22, 2018, on Facebook from Massey's IP address, Henry (or, again, whoever was using Henry's account) had sent two photos of Henry.

Haiduk conceded that Henry had not always been her exclusive suspect. When Mother had called on May 23, 2018, and requested a case update, Haiduk returned Mother's call two days later to advise her that the electronic evidence was pointing to Massey.

And the evidence showed that Haiduk had not exhausted all the possible areas of investigation. For example, Haiduk acknowledged not going to Massey's home to verify who lived there.

The inquiry eventually turned to whether someone had hacked Henry's Facebook account. Haiduk acknowledged that Facebook and other types of online media could be hacked. She explained that the telltale sign that an account had been hacked was that the IP addresses no longer conformed to the owner's typical locations but, instead, suddenly came from other locations in the United States or the world. But, said Haiduk, in Henry's case, all the IP addresses were in the location where she knew Henry lived[7] or in locations that she knew Henry routinely frequented, so she saw no indication that his Facebook account had been hacked.

Haiduk further noted that Henry's vocabulary was somewhat consistent with the vocabulary used in the messages to Mother. For example, when communicating with another woman on Facebook, Henry said, "What it do kinfolk." And when Henry communicated on Facebook with Mother, he said, "Cuz this ya kinfolk."

In Henry's defense, he presented the testimony of his mother, Edith Henry. Edith[8] said that Henry lived with her between January and July 2018. Edith maintained that while Henry lived with her, he had no computer or cell phone. Rather, Henry used her cell phone.

Edith said that Henry and Massey had two children together. At the time of trial, one child was thirteen years old and the other was twelve.

---

[7]Contextually, Haiduk appears to have concluded that Henry lived at Massey's house.

[8]We use her first name for convenience and to avoid confusion.

Edith described Henry's relationship with Massey as bad. She asserted that Henry and Massey had an on-again-off-again relationship.

Edith maintained that while Henry lived with her in 2018, Henry and Massey were not on good terms. According to Edith, another man, James Nobles, was living with Massey at Massey's house, and Henry "was having issues" with Nobles's living there because Henry did not like how Nobles interacted with Henry's two children.

Specifically, Edith asserted that Nobles was living with Massey in April 2018. Edith acknowledged, however, that Facebook messages between Massey and Henry on April 2, 2018, showed that Massey had informed Henry that Nobles no longer lived with her. Despite that, Edith maintained that Massey's message was not necessarily true and that, to Edith's knowledge, Nobles lived with Massey after April 2, 2018.

Edith denied that Henry had a Facebook account. Edith acknowledged, however, that she and Henry had exchanged comments on Facebook.

## IV. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

## V. Discussion

When viewed in the light most favorable to the verdict, we hold that based on the evidence's cumulative force, the jury's necessary inferences were reasonable. *Id.* A reasonable juror could have found beyond a reasonable doubt that Henry was the person who—while believing he was communicating with twelve-year-old Jane—communicated with Mother on Facebook and by text message. We summarize below the evidence supporting the jury's finding.

10

The Facebook account used to contact Jane was Henry's. No evidence suggested that someone had hacked Henry's Facebook account; just the opposite, the evidence was consistent with no one's having hacked his account.

Henry maintains that someone might have posed as him in the same way that Mother posed as Jane. The evidence showed that both the Facebook account and cell phone were Henry's. There was no evidence that anyone purloined Henry's cell phone. And there was no explanation why anyone other than Henry would post selfies of Henry on Henry's Facebook account. Additionally, the person communicating with Mother was familiar with Mother's other family members and with Henry's extended family's neighborhood. A hacker or someone posing as Henry would be less likely to have this familiarity.

Further, through acquaintances that Mother and Henry had in common, Mother verified that the 214 number used to communicate with her was Henry's. In other words, Mother learned that the 214 number was the one that others routinely used to phone Henry.

Other indicia linked both the Facebook account and the 214 number to Henry. For example, when Henry was communicating on Facebook with another woman, he asserted that the 214 number was his. In another instance on Facebook, Henry used the word "kinfolk," which also appeared in the communications with Mother. Elsewhere on Facebook, Henry even sent two photos of himself. These examples

11

point to the reasonable conclusion that both the Facebook account and the 214 number were Henry's.

Additional evidence supported the conclusion that the 214 number was Henry's. Specifically, when Haiduk phoned the 214 number, the person who returned her call identified himself as Quincy—Henry's first name. And although Haiduk could not vouch that the voice was Henry's, the jury heard both the recording of Haiduk's conversation with Quincy and Henry's voice when he read out loud two paragraphs from the court's charge. Based on the verdict, the jury concluded that the two voices were consistent.

The jury also had to resolve why Massey's name—in addition to Henry's—kept surfacing. For example, Henry's Facebook account had two email addresses connected to it. One was his, and the other was Massey's. Similarly, the 214 number was one of two numbers on Massey's phone plan. Additionally, the IP address for Henry's Facebook account and the home address associated with the two phone numbers on Massey's plan were both linked to Massey's house. Accordingly, the evidence showed a consistent tie between Henry, Massey, and Massey's home.

The other evidence, however, shed considerable light on the connection between Henry, Massey, and Massey's home. Henry and Massey had two children together, and based on the children's ages at the time of trial, they were born around 2009 or 2010. Coincidentally, Henry's Facebook account was created in 2009. Thus, a rational juror could reasonably attribute the fact that Massey was linked to both

Henry's Facebook account and 214 number to the relationship Henry and Massey shared dating back to at least 2009.

Other evidence, although contradicted, further supported the reasonable inference that Henry lived with Massey in April 2018. Over a two-month period from April 1, 2018, to June 1, 2018, someone had logged into Henry's Facebook account about twenty-four times from the IP address corresponding with Massey's house. Twenty-four log-ons from the same location over that time span supports the inference that the person doing so lived there.

Although Edith testified that Henry lived with her at all the relevant times, the jury did not have to believe her. Factfinders may disbelieve a witness's testimony in part or in its entirety; this is true regardless of whether other evidence contradicts the witness's testimony. *Hernandez v. State*, 161 S.W.3d 491, 501 (Tex. Crim. App. 2005). Here, Edith was Henry's mother, which could cause a juror to reasonably question her impartiality. *See Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006); *Houston v. State*, No. 02-17-00025-CR, 2018 WL 1095541, at *6 & n.4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication) ("Disregarding or otherwise discounting the alibi testimony of Houston's mother was well within the jury's credibility prerogative.").

And, further, Edith had been caught saying something that was demonstrably not true—Edith asserted that Henry did not have a Facebook account, but other evidence showed that she had communicated with him on Facebook. Because Edith

13

had communicated with Henry on Facebook, she should have known Henry had a Facebook account, but she represented the contrary to the jury.

That was not the only instance that Edith gave testimony that contradicted other evidence. Edith maintained that Nobles lived with Massey in April 2018. But Massey herself had sent Henry a message in early April 2018 in which she asserted that Nobles no longer lived with her. When confronted with Massey's message to Henry, Edith effectively opined that Massey was lying to Henry. The jury, however, did not have to rely strictly on Massey's message and Edith's testimony to resolve whether Nobles was still living with Massey in April 2018. The jury also had evidence that someone had logged into Henry's Facebook account from Massey's home around twenty-four times in April and May 2018. If Nobles were still living with Massey, this would have placed Nobles and Henry in the same home on about two dozen occasions. A reasonable factfinder could have determined that this dynamic was unlikely. Additionally, there was no testimony that Henry logged into his Facebook account from Edith's home during the relevant period. In short, the jury had many reasons to question Edith's credibility and to disregard her testimony.

The jury, as the factfinder, resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *See Harrell*, 620 S.W.3d at 914. As an appellate court, we presume that the jury resolved any conflicting inferences in the verdict's favor, and we defer to those determinations. *See Braughton*, 569 S.W.3d at 608. We may not re-evaluate the evidence's weight and

14

credibility. *See Queeman*, 520 S.W.3d at 622. Nor may we substitute our judgment for that of the jury. *See id.*

We hold that a reasonable juror could have found beyond a reasonable doubt that Henry was the person who communicated with Mother on Facebook and by text message while believing he was communicating with twelve-year-old Jane. We overrule Henry's issue.

## VI. Conclusion

Having overruled Henry's issue, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 25, 2023